UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ESTATE OF DAKOTA MICHAEL ANDERSON-TURNER,

Plaintiff,

v.

COUNTY OF LAKE, et al.,

Defendants.

Case No. 25-cv-05431-SI

**ORDER DENYING IN PART AND GRANTING IN PART COUNTY DEFENDANTS' MOTION TO DISMISS FAC, AND SCHEDULING FURTHER CASE MANAGEMENT CONFERENCE**

Re: Dkt. No. 41

Now before the Court is the motion by County defendants to dismiss the first amended complaint. Pursuant to Civil Local Rue 7-1(b), the Court found this matter suitable for resolution without oral argument and vacated the hearing. For the reasons set forth below, the Court DENIES IN PART and GRANTS IN PART the motion to dismiss, and schedules a Further Case Management Conference for May 7, 2026.

**BACKGROUND**

**I.      Factual Background**

For the purposes of deciding the motion to dismiss, the Court treats as true the allegations in the first amended complaint. This lawsuit stems from the death of Dakota Michael Anderson-Turner, who died on June 17, 2024, while a pretrial detainee at Lake County's Hill Road Correctional Facility ("the Jail"). Plaintiff is the estate of Dakota Michael Anderson-Turner, which brings these survival claims through special administrator Charles Ronald Turner, Dakota's older

brother.[1]  Dkt. No. 37 ("FAC") ¶ 3.

In the four years before his death, Dakota had been incarcerated at the Jail several times, and defendants witnessed him suffer from opiate and alcohol withdrawal accompanied by frequent vomiting and diarrhea, leading to dehydration.  *Id.* at 1.

On June 11, 2024, at about 10:50 a.m., Dakota was arrested on two bench warrants and booked into the Jail.  *Id.* ¶ 82.  Defendant Lynn Ann Brookes, the nurse who charted the "receiving screening" for Dakota, noted that he "appeared under the influence, intoxicated, or withdrawing from a substance," and charted that he needed an "urgent (tomorrow)" medical and mental health referral but did not recommend medical monitoring.  *Id.* ¶¶ 27, 83, 85-86.[2]  Dakota advised Brookes and defendant Philip Gordon Wilcox, a physician's assistant at the Jail, that he had "a long history of abusing opioids, was acutely intoxicated on fentanyl, and further advised Defendants of his risk of withdrawal[.]"  *Id.* ¶¶ 30, 94.

Based on notes by Lake County Sheriff's Office Deputies, Dakota initially was housed in Cell 1HLD 2 Bed due to his withdrawal symptoms.  *Id.* ¶¶ 95-97.  Dakota was sent there "under camera observation until cleared by medical."  *Id.* ¶ 95.  The FAC alleges that this bed "was an observation cell in the Booking area with a staff person nearby and a camera, so that DAKOTA could be closely monitored."  *Id.* ¶ 97.  However, no one actually monitored the camera, and Dakota was suffering from vomiting and diarrhea.  *Id.* ¶¶ 97-98.

On June 13, 2024, Dakota was "cleared" by someone on the medical team to be housed in Pod E, Bed 8, which was dormitory-style housing where he would not be closely observed.  *Id.* ¶¶ 106, 109.  Dakota was still suffering from vomiting and diarrhea.  *Id.* ¶ 107.

On June 14, 2024, Dakota was still vomiting and was moved back to be housed in the Booking area for further observation.  *Id.* ¶¶ 110-112.  Later that day, Dakota was charted as having a heartbeat of 123 and 137 beats per minute.  *Id.* ¶¶ 115-117.  He was at that point experiencing

---

[1] Following the example in plaintiff's papers, the Court will refer to the decedent as "Dakota."

[2] Although the FAC contains detailed allegations regarding the actions and inactions of the medical defendants in this case, this Order does not recount those allegations in detail here, as the medical defendants do not move to dismiss.

United States District Court
Northern District of California

tachycardia due to severe dehydration. *Id.* He was still vomiting and experiencing diarrhea. *Id.* ¶¶ 116, 118.

Early in the day on June 15, 2024, there were allegedly two incidents that occurred with Dakota. *Id.* ¶¶ 119-120. The first culminated in two deputies and defendant Correctional Sergeant Jacob Masdeo placing Dakota on his stomach and handcuffing him. *Id.* ¶ 119. The second incident occurred with Masdeo, defendant Correctional Officer Zachary Villalobos, and a non-defendant deputy and "required a relatively minor use of force." *Id.* ¶¶ 120-122. The FAC alleges that, in retaliation, nurse Brookes then cleared Dakota to be moved from the booking cell to administrative segregation in B Pod, Bed 3, where he would not be closely observed. *Id.* ¶¶ 125-126, 129. Deputies moved Dakota to Bed 3 "in a spit mask and full restraints[.]" *Id.* ¶ 130. Another detainee in a neighboring cell observed Dakota "throwing up and pooping, and could smell the odor." *Id.*

On June 16, 2024, Dakota continued to experience vomiting, diarrhea, and severe dehydration. *Id.* ¶ 135. That day, Dakota was seen by medical staff only twice, at 9:34 a.m. and at about 11:01 p.m. *Id.* ¶ 134.

The FAC alleges that on June 17, 2024, between midnight and 11:10 a.m., defendants Villalobos, Masdeo, and Correctional Officer Alejandro Castillo did not perform any meaningful safety checks on Dakota nor did any Doe defendant "'monitoring' the video feed of DAKOTA's cell look to observe and appropriately respond to DAKOTA's frequent and voluminous vomiting and diarrhea." *Id.* ¶ 136. Surveillance videos show that between midnight and 2:54 a.m. defendants Villalobos, Masdeo, and Castillo conducted safety checks once an hour instead of every thirty minutes, as plaintiff contends was required. *See id.* ¶ 152. "[I]n addition to being too infrequent, these 'safety' checks were also qualitatively insufficient because they consisted of nothing more than stopping at DAKOTA's cell door for a couple seconds, without trying to speak to DAKOTA." *Id.* At 3:44 a.m., two correctional officers stopped at Dakota's cell.[3] *Id.* ¶ 153. One of them said, "I can't tell if he's breathing or not." *Id.* The second asked if Dakota was hurt and the first officer said he could not tell. *Id.* They did not summon medical care. *Id.* At 4:37 a.m., a correctional

---

[3] The FAC alleges that these two officers were two of defendants Villalobos, Masdeo, Castillo, and/or a Doe defendant. FAC ¶ 153.

United States District Court
Northern District of California

officer (either Villalobos, Masdeo, Castillo, or a Doe defendant) stopped at Dakota's cell for about 3.5 seconds. *Id.* ¶ 154. At 5:23 a.m., Villalobos and Castillo stopped at Dakota's cell. *Id.* ¶ 155. They knocked on the cell door but did not speak to Dakota. *Id.* They also noticed "a copious amount of vomit" inside Dakota's cell. *Id.* "As they left, one of them said that he 'would have went in there,' to check on DAKOTA." *Id.* At 7:25 a.m., either Villalobos or Castillo stopped at the cell for two seconds, without trying to speak to Dakota. *Id.* ¶ 156. At about 8:16 a.m., 9:03 a.m., 9:53 a.m., and 10:38 a.m., either Villalobos or Castillo walked by Dakota's cell without stopping. *Id.* ¶¶ 157, 159-161. No defendant sought medical attention for Dakota during the night or early morning of June 17. Although defendant Rebecca Vargas, a nurse at the Jail, alleged in a chart note that, at about 8:55 a.m., Dakota refused to have his pulse taken, surveillance video shows that neither Vargas nor any other medical staff "saw DAKOTA at all on June 17, 2024, until about 11:13 a.m., after DAKOTA was found unresponsive." *Id.* ¶¶ 34, 158.

At about 11:00 a.m., Villalobos told Masdeo about the vomit on Dakota's cell floor and said that he (Villalobos) wanted to move Dakota to a clean cell. *Id.* ¶ 162. At about 11:10 a.m., Masdeo, Villalobos, and Castillo approached Dakota's cell. *Id.* ¶ 163. On surveillance video, Dakota "can be heard retching repeatedly[.]" *Id.* Villalobos and Masdeo attempted to assist Dakota to his feet but immediately put him back on the floor. *Id.* ¶ 164. Dakota was sweaty and clammy. *Id.* At about 11:13 a.m., Villalobos radioed medical staff to come evaluate Dakota. *Id.* ¶ 165. Vargas "charted the nature of the emergency as 'loss of consciousness/unresponsive.'" *Id.* Masdeo shined his flashlight in Dakota's eyes "and saw minimal to no pupil reaction." *Id.* At about 11:13 a.m., a RN "arrived and tried and failed to get a verbal response from DAKOTA." *Id.* ¶ 166. Dakota had no blood pressure and a pulse of 56 that would later go up to 133. *Id.* His O2 stats were at 84% and would decline to 56% and he had no spontaneous respiration. *Id.* Various individuals at the jail, including some of the defendants, performed sternum rubs, wheeled Dakota to the Booking area, called an ambulance, began administering oxygen, and performed CPR and chest compressions. *Id.* ¶¶ 167-179. They also administered Narcan, without effect. *Id.* ¶ 176. At 11:26 a.m., the AED administered a shock to Dakota. *Id.* ¶ 180. At 11:29 a.m., emergency medical services arrived and took Dakota to the hospital. *Id.* ¶¶ 186-190. Dakota arrived at the hospital at 11:43 a.m. *Id.* ¶ 191.

United States District Court
Northern District of California

4

At 11:55 a.m., Dakota was pronounced deceased. *Id.* ¶ 192.

## II.    Procedural Background

On June 28, 2025, plaintiff brought this lawsuit. Dkt. No. 1. After County defendants moved to dismiss, the parties stipulated to the filing of a first amended complaint.[4] Plaintiff filed the first amended complaint on October 21, 2025. Dkt. No. 37 ("FAC"). The FAC names as defendants: the County of Lake; Villalobos; Castillo; Masdeo; Brookes; Wilcox; Vargas; Matthew Dundon as Trustee of Wellpath Holdings, Inc. Liquidating Trust; California Forensic Medical Group; Matthew Todd Hallman, LVN; and Does 1-30.[5] The FAC brings four claims for relief: (1) 42 U.S.C. § 1983, 14th Amendment, Deliberate Indifference to Serious Medical Needs/Conditions of Confinement, against defendants Wilcox, Brookes, Hallman, Vargas, Villalobos, Castillo, Masdeo, and Does 1-30; (2) 42 U.S.C. § 1983, *Monell* Liability against Lake County and California Forensic Medical Group; (3) California Civil Code § 52.1, the Bane Act, against Wilcox, Brookes, Hallman, Vargas, Villalobos, Castillo, Masdeo, and Does 1-30; and (4) Negligence, survival claim, against Wilcox, Brookes, Hallman, Vargas, Villalobos, Castillo, Masdeo, and Does 1-30.

On November 4, 2025, the medical defendants answered the FAC. Dkt. No. 40. County defendants again moved to dismiss. Dkt. No. 41. County defendants argue that the Section 1983 claim against Masdeo must be dismissed for failure to allege sufficient facts and/or because Masdeo is entitled to qualified immunity. They argue that the allegations are insufficient to sustain the *Monell* claim or the Bane Act claim. They also argue they are immune from the negligence claim under California Government Code section 845.6.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if

---

[4] "County defendants" are the County of Lake and defendants Villalobos, Castillo, and Masdeo.

[5] For ease of reference, the Court will refer in this Order to the non-County defendants, with the exception of Matthew Dundon, as "the medical defendants." Matthew Dundon is sued as a nominal defendant as permitted by order of the bankruptcy court. FAC ¶ 18.

it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although courts do not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 544, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. The plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Id.*

In deciding whether the plaintiff has stated a claim, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1055 (9th Cir. 2008). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

### I.    Section 1983 Claim Against Masdeo (First Claim)[6]

Defendant Masdeo argues that the allegations of the FAC do not establish that he acted with

---

[6] Although the heading in defendants' motion says that "The individual defendants are entitled to qualified immunity[,]" defendants only brief the issue as to Masdeo. *See* Dkt. No. 41 ("Mot.") at 5-6; *see also* Dkt. No. 47 ("Reply") at 2-3.

United States District Court
Northern District of California

deliberate indifference to Dakota's medical needs and therefore that Masdeo is entitled to qualified immunity. Masdeo further argues that there are no allegations that he was aware that the safety checks on Dakota were somehow deficient and that Masdeo could not have acted with deliberate indifference when Dakota was "under medical supervision just two hours before" his death. Mot. at 7.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201). The court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Id.* at 236.

The Ninth Circuit has explained that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) [hereinafter *Gordon I*] (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). To meet this standard, "the plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* at 1125 (quoting *Castro*, 833 F.3d at 1071).

Here, the Court finds the allegations against Masdeo sufficiently allege deliberate indifference for the Section 1983 claim to proceed against him at this stage. Masdeo was the Correctional Sargeant at the Jail the night before and the morning of Dakota's death. He was also tasked with supervising defendants Villalobos and Castillo. FAC ¶ 13. The FAC alleges that on June 17, 2024, between midnight and 11:10 a.m., when Dakota was found unresponsive in his cell,

United States District Court
Northern District of California

United States District Court
Northern District of California

neither Masdeo nor his supervisees "performed any meaningful safety checks" on Dakota and "did not summon medical care for DAKOTA, despite their awareness that he was gravely sick." *Id.* ¶ 136. The FAC alleges that the "safety checks" that Masdeo and his supervisees performed were both too infrequent and "were also qualitatively insufficient . . . ." *Id.* ¶ 152. At 3:44 a.m., two correctional officers (two of Masdeo, Villalobos, Castillo and/or a Doe defendant) stopped at Dakota's cell and one said, "I can't tell if he's breathing or not." *Id.* ¶ 153. Neither attempted to confirm he was breathing or summon medical care. *Id.* At 4:37 a.m., two officers stopped at Dakota's cell for about 3.5 seconds "and did not perform an adequate safety check[.]" *Id.* ¶ 154. At 5:23 a.m., Villalobos and Castillo stopped at Dakota's cell, "noticed a copious amount of vomit inside" and did not speak to Dakota or summon medical care. *Id.* ¶ 155. Two hours went by without another check, until at 7:25 a.m. either Villalobos or Castillo stopped at Dakota's cell for two seconds without trying to speak to Dakota. *Id.* ¶ 156. At 8:16 a.m. and 9:03 a.m., either Villalobos or Castillo walked by Dakota's cell without stopping. *Id.* ¶¶ 157, 159. At 9:53 a.m. and 10:38 a.m., one of the two walked by without stopping or turning to face the cell door. *Id.* ¶¶ 160-161. The Court finds these allegations suffice to meet the deliberate indifference standard and for the Section 1983 claim against Masdeo to remain in the case. "A supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001) (internal quotation marks and citations omitted). As to Masdeo, the FAC sufficiently alleges both his personal involvement in performing inadequate safety checks and a causal connection between the inadequate safety checks performed by his supervisees and the harm to Dakota.

Masdeo does not dispute that pretrial detainees have a clearly established constitutional right to adequate medical care and that, since 2021, they have a right to direct-view safety checks. *See Gordon I,* 888 F.3d at 1124-25 (discussing history of pretrial detainees' right to adequate medical care); *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) [hereinafter *Gordon II*] (holding that "pre-trial detainees do have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment"). What Masdeo appears to dispute is

8

whether it was clearly established that the safety checks needed to be of a certain duration or quality. Reply at 3. But Masdeo concedes that *Gordon II* established the right to direct-view safety checks to determine if medical needs are presented, *see id.*, and the FAC alleges either that the safety checks performed on June 17 were inadequate for these purposes. Such factual disputes are inappropriate for resolution on a motion to dismiss and also make Masdeo's bid for qualified immunity premature at this stage. *Cf. Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (where material factual "disputes exist, summary judgment is appropriate only if Defendants are entitled to qualified immunity on the facts as alleged by the non-moving party") (citing *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).

As noted above, Masdeo additionally argues that he should be immune from liability because Dakota was under medical supervision by professionals and that Masdeo was not aware the medical care was inadequate. Mot. at 7. In opposition, plaintiff points out that the FAC alleges the medical notes from the morning of Dakota's death were falsified. Dkt. No. 46 ("Opp'n") at 12. More specifically, the FAC alleges that nurse Vargas "alleged in a chart note that, at about 8:55 a.m., DAKOTA refused to have his pulse taken" but that surveillance video shows that neither Vargas nor any other medical staff saw Dakota "at all on June 17, 2024, until about 11:13 a.m., after DAKOTA was found unresponsive." FAC ¶ 158. In other words, the FAC alleges that despite knowing that Dakota's cell was filled with vomit and despite uncertainty about whether Dakota was breathing, Masdeo and/or his supervisees failed to summon medical care at all until the point where Dakota was already unresponsive. In the reply brief, Masdeo does not address this argument but continues to misread the FAC's allegations and assert that there is a lack of "clearly established law" that a correctional officer is deliberately indifferent to an inmate who is chronically throwing up but is "under general medical supervision[.]" *See* Reply at 3.[7]

---

[7] Masdeo also cites several cases from the District of Oregon declining to find defendants deliberately indifferent to a prisoner's medical needs under the Eighth Amendment, where there were allegations or evidence in the record that the prisoner was under medical care. *See* Mot. at 7 (citing *Redding v. Dhaliwal*, No. CV 10-998-PK, 2011 WL 6153132, at *12 (D. Or. Oct. 4, 2011); *Nordenstrom ex rel. Estate of Perry v. Corizon Health, Inc.*, No. 18-cv-01754-HZ, 2021 WL 2546275, at *9 (D. Or. June 18, 2021)). However, where the inmate-patient is a pretrial detainee rather than a convicted prisoner, his rights derive from the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Gibson v.*

United States District Court
Northern District of California

Because the factual allegations suffice and it is premature to resolve the factual disputes Masdeo raises, the Court denies Masdeo's motion to dismiss the First Claim.

## II.    *Monell* Liability (Second Claim)

Plaintiff's Second Claim alleges liability against the County and California Forensic Medical Group under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see id.* at 690; however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior.  See Bd. of Cnty. Comm'rs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).  To establish an official policy that would give rise to *Monell* liability, a plaintiff must allege facts to support one of the following to survive dismissal of his claim: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; or (3) a final policy-maker's involvement in, or ratification of, the conduct underlying the violation of rights.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010) (synthesizing authorities), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Defendant makes three arguments for dismissal of the *Monell* claim: (1) that the "host of 'failures'" plaintiff lists in the FAC are neither based on express policies nor are supported by facts sufficient to show a pervasive custom or practice; (2) that the allegations of a failure to train are conclusory;  and (3) that plaintiff has not adequately pled facts in support of a ratification theory. Mot. at 8-10.

The Court finds that, while some of the *Monell* claim may survive a motion to dismiss, much of the claim as pled does not "contain sufficient allegations of underlying facts to give fair notice

---

*Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).  Although a deliberate indifference test applies to a pretrial detainee's claim, it is an objective deliberate indifference test, rather than the subjective deliberate indifference test applicable to a prisoner's claim. *See Gordon I*, 888 F.3d at 1122 & n.4.

United States District Court
Northern District of California

and to enable the opposing party to defend itself effectively." *See AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (applying *Iqbal* pleading standard to *Monell* claims) (citation omitted).  In the opposition, plaintiff argues that "the long-standing short staffing of the Jail was the moving force behind the lack of safety checks of Dakota[.]" Opp'n at 14.  Plaintiff cites to the non-conclusory allegations of the FAC regarding the Lake County Civil Grand Jury's 2019-2020 report, which found "there are too few corrections officers staffing the Jail" and that the understaffing meant that inmates were left on their own to a "worrisome" degree. *Id.* at 13; s*ee also* FAC ¶¶ 139-140.  But the FAC's *Monell* claim encompasses many more theories besides the understaffing/inadequate safety check theory.  The FAC alleges, for instance, that the County had a policy or practice of contracting "for obviously inadequate medical care for inmates[;]" of "fail[ing] to have individual treatment plans for inmates with serious medical needs;" and of "cover[ing] up violations of constitutional rights" by failing to property investigate incidents and "allowing, tolerating, and/or encouraging" County staff to file false reports. *See generally* FAC ¶ 279.  The FAC does not contain sufficient facts to back up these claims.  Under a *Monell* policy or custom/practice theory, proof of random acts or isolated incidents of unconstitutional action by a non-policymaking employee is insufficient to establish the existence of a municipal policy or custom. *See Rivera v. Cnty. of Los Angeles*, 745 F.3d 384, 398 (9th Cir. 2014); *McDade v. West*, 223 F. 3d 1135, 1142 (9th Cir. 2000); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

The Court also agrees with defendants that the ratification theory is inadequately pled.  If plaintiff pursues a ratification theory, plaintiff must be able to allege that an official with final policymaking authority approved the decisions at issue. *See Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004); *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).  Although the FAC mentions ratification in passing, *see, e.g.*, FAC ¶¶ 279, 282, 284, 286, it is unclear from the FAC who plaintiff is alleging that authorized policymaker is.

Accordingly, the *Monell* claim is dismissed, with leave to amend.

## III.    Bane Act (Third Claim)

Plaintiff's third claim is brought under California Civil Code section 52.1, the Tom Bane

11

United States District Court
Northern District of California

Civil Rights Act.  Plaintiff brings this claim against the individual County defendants (Masdeo, Villalobos, and Castillo) as well as against the individual medical defendants.  Defendants argue that the FAC "lump[s] all Defendants together" and therefore is factually insufficient and does not meet the specific intent requirement for a Bane Act violation.  Mot. at 11.

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'"  *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th 1230, 63 Cal. Rptr. 3d 741, 742 (2007)).  "Claims under section 52.1 may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims."  *Id.* at 1040-41 (citing *Venegas*, 63 Cal. Rptr. 3d at 753).  To properly allege a claim under the Bane Act, a claimant must demonstrate that the defendant acted with "a specific intent to violate" the constitutional right at issue.  *Id.* at 1043 (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017), as modified (Nov. 17, 2017)).  To determine whether the required intent exists, the finder of fact will ask: "Did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by" the right at issue?  *Cornell*, 17 Cal. App. 5th at 803.  Notably, a defendant need not "in fact recognize the [unlawfulness] of his act" to be found culpable.  *Id.*  Acting "in reckless disregard of constitutional [or statutory] prohibitions or guarantees" is enough.  *Id.*

The Court finds that at this stage the allegations suffice to sustain a Bane Act violation against defendants Masdeo, Villalobos, and Castillo, for largely the same reasons recounted above with the Section 1983 claim.  For the same reasons that the FAC alleges these defendants acted with deliberate indifference to Dakota's right to adequate medical care, the FAC sufficiently alleges they acted in reckless disregard of Dakota's constitutional rights.  To draw out a few examples, the FAC alleges that on the day Dakota died, two of defendants Villalobos, Castillo, Masdeo, and/or a Doe defendant stopped at Dakota's cell at 3:44 a.m.  FAC ¶ 153.  One said to the other, "I can't tell if he's breathing or not."  *Id.*  Instead of investigating further, attempting to speak with Dakota, or summoning medical care, the officers had the following exchange: "The second Correctional Officer

asked whether DAKOTA was hurt, and the first Correctional Officer replied that he could not tell. The second Correctional Officer laughed, and the first Correctional Officer said that DAKOTA 'looked like' and motioned to his stomach." *Id.* At 5:23 a.m. Villalobos and Castillo "noticed a copious amount of vomit inside of DAKOTA's cell" but did not take steps to do anything about it until 11:00 a.m., by which point Dakota was unresponsive. *Id.* ¶¶ 155, 162-166. None of the individual County defendants checked on Dakota between 5:23 a.m. and 7:25 a.m. *Id.* ¶¶ 155-156. After the 7:25 a.m. check, no individual County defendant stopped at Dakota's cell until 11:10 a.m. *Id.* ¶¶ 156-163. The Court disagrees with defendants that these allegations are insufficient to show the intent element for a Bane Act violation. The fact that plaintiff has not been able to identify in the pleadings whether certain of the June 17 safety checks were performed by Masdeo, Villalobos, or Castillo does not undermine the claim. Such allegations are more appropriately fleshed out through discovery.

The motion to dismiss the Third Claim is denied.

## IV.    Negligence (Fourth Claim)

Finally, defendants move to dismiss the fourth claim for negligence, citing California Government Code section 845.6. Section 845.6 creates blanket immunity for public entities or public employees who proximately injure a prisoner through their failure "to furnish or obtain medical care for a prisoner in his custody." Cal. Govt. Code § 845.6. Immunity for public entities and public employees is removed, however, when the "employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." *Id.* The California Court of Appeal has remarked that "[s]ection 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing that care." *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1070 (2013).

Defendants' motion to dismiss this claim is premised on a misreading of the allegations of the FAC that the Court already noted above. In short, defendants say they are immune from the negligence claim under Section 845.6 because Dakota was seen by medical staff at 8:55 a.m. on the

13

United States District Court
Northern District of California

morning of Dakota's death.  Mot. at 12.  In fact, the FAC alleges that the 8:55 a.m. medical note was incorrect and that surveillance camera footage shows that no medical staff saw Dakota at all on June 17, 2024, until Dakota was found unresponsive at 11:13 a.m.  *See* FAC ¶ 158.  The individual County defendants are not entitled to dismissal under Section 845.6 based on the facts as alleged in the FAC.

The motion to dismiss the Fourth Claim is denied.

## CONCLUSION

For the reasons set forth above, the Court DENIES the motion to dismiss the First, Third, and Fourth Claims from the FAC.  The Court GRANTS the motion to dismiss the Second Claim for *Monell* liability, with leave to amend.  **Plaintiff's Second Amended Complaint is due at the same time as the stipulated, last date to add new parties or amend the pleadings, March 27, 2026.  A further Case Management Conference is scheduled for May 7, 2026.  An updated Joint Case Management Statement is due April 30, 2026.**[8]

**IT IS SO ORDERED**.

Dated:  January 16, 2026

SUSAN ILLSTON
United States District Judge

---

[8] Discovery is open.  Further dates suggested in the parties' (Amended) Initial Joint Case Management Statement will be considered at the May 7, 2026 CMC.

14